**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MELANIE RADEMAKER, | ) | CASE NO. 1:20 CV 36 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Melanie Rademaker ("Plaintiff" or "Rademaker"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is VACATED and REMANDED for further consideration consistent with this opinion.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On February 27, 2017, Rademaker filed an application for DIB and SSI alleging a disability onset date of February 24, 2017, and claiming she was disabled due to depression, borderline personality disorder, alcoholism, post traumatic stress disorder and eating disorder.  (Transcript ("Tr.") at 189, 191, 222.)  The applications were denied initially and upon reconsideration, and Rademaker requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 69-70.)

On September 10, 2018, an ALJ held a hearing, during which Rademaker, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id*. at 30-62.) On December 13, 2018, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id*. at 12.)  The ALJ's decision became final on November 18, 2019, when the Appeals Council declined further review. (*Id*. at 1.)

On January 8, 2020, Rademaker filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 14.) Rademaker asserts the following assignments of error:

> (1)    Whether the ALJ's decision is supported by substantial evidence when the ALJ failed to consider whether Ms. Rademaker's impairment met the requirements of Listing 11.02A.

> (2)    Whether the ALJ's decision is supported by substantial evidence when insufficient evidentiary weight was given to the opinion of Ms. Rademaker's nurse practitioner, Ms. Herwig.

> (3)    Whether the ALJ's residual functional capacity assessment is supported by substantial evidence when the ALJ failed to consider the limitations and restrictions resulting from Ms. Rademaker's ECT treatment.

(Doc. No. 13 at 1.)

2

## II.    EVIDENCE

**A.    Personal and Vocational Evidence**

Rademaker was born in 1979 and was thirty-nine years old at the time of her administrative hearing, making her a "younger" person under social security regulations at all relevant times. (Tr. 22.) *See* 20 C.F.R. §§ 404.1563 & 416.963. She attended four years of college and is able to communicate in English. (*Id.*) She has past relevant work as a receptionist and administrative clerk, both performed at the light exertional level and classified as semi-skilled. (*Id.* at 57.)

**B.    Relevant Medical Evidence[2]**

**1.    Mental Impairments**

On August 10, 2016, Rademaker saw her nurse practitioner, Mary Jo Slattery, for treatment of depression. She reported that, in the past year, her depression had gradually worsened. Prior treatment included counseling and Cymbalta, which provided moderate relief. (*Id.* at 313.) Nurse Slattery diagnosed a mild episode of recurrent major depressive disorder, and noted that Rademaker had been seeing a counselor for over a year and had a couple of major negative life events in the past six months that brought her mood further down. She prescribed a trial of a low dose of Abilify. (*Id.* at 315.)

On December 20, 2016, Rademaker returned to Nurse Slattery, and reported that her depression and anxiety had worsened after she quit smoking for three weeks. (*Id.* at 308.) After an examination, Nurse Slattery concluded that Rademaker's depression was controlled with Abilify. (*Id.* at 312.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

On April 27, 2017, Rademaker underwent a consultative psychological evaluation conducted by April M. Sobieralski, Psy.D.  (*Id*. at 330-36.)  Rademaker reported that she is an alcoholic and has maintained sobriety for twelve years. She stated that she feels anxious and depressed every day. She was recently fired from a job for missing too much work and not giving enough notice when calling off.  (*Id*. at 332.)  Dr. Sobieralski noted that Rademaker presented with low mood, flat affect, slow, soft speech, and variable eye contact.  (*Id*. at 333.)  Dr.  Sobieralski offered a diagnosis of alcohol use, moderate, in sustained remission; major depressive disorder, recurrent, moderate; unspecified anxiety disorder; and binge eating disorder. Dr. Sobieralski opined that, with appropriate interventions, Rademaker's prognosis is fair. (*Id*. at 334.)  Dr. Sobieralski also opined that Rademaker's ability to persist on tasks appears related to her level of symptomology, noting she has lower functioning when symptomatic with depression. (*Id*. at 335.) Dr. Sobieralski observed that Rademaker may have a tendency to use ineffective coping mechanisms when dealing with pressure. (*Id*. at 336.)

On May 16, 2017, Rademaker returned to Nurse Slattery, reporting that her anxiety was getting much worse, and her depression was not lifting.  (*Id*. at 344.)  Nurse Slattery noted that Rademaker's symptoms seemed to have worsened with Abilify, which was a problem Rademaker had previously experienced with Effexor.  (*Id*. at 345.)  During the examination, Nurse Slattery noted Rademaker had a very flat affect, and referred her to Far West Center.  (*Id*. at 347.)

On June 6, 2017, Rademaker underwent a mental health assessment at the Far West Center. Her presenting problems included depressed mood, fatigue, low energy, low motivation, impaired concentration, suicidal thoughts, anxiety, panic attacks, and traumatic stress.  (*Id*. at 1330.)  Based upon Rademaker's history and observations during the intake, Rademaker was diagnosed with

4

bipolar disorder, major depressive disorder, posttraumatic stress disorder, alcohol use disorder in remission, and stimulate use disorder in remission. (*Id*. at 1335.)

On June 17, 2017, Rademaker began treatment with Grace Herwig, APRN, at Far West Center. She reported that she feeling a lot better on Latuda. (*Id*. at 1384.) Nurse Herwig increased Latuda to 40 mg daily and decreased Rademaker's Cymbalta to 30 mg daily.  (*Id*. at 1385.)

On August 29, 2017, Rademaker returned to Nurse Herwig, reporting that her anxiety had gotten really bad.  Nurse Herwig noted that Rademaker's dose of Cymbalta had been increased to 80 mg about two weeks ago. Rademaker agreed to a trial of Buspar for anxiety.  (*Id*. at 1378.)

On September 26, 2017, Nurse Herwig noted Rademaker was  moderately depressed. She had obsessive worries, and her socialization was limited. (*Id*. at 1372.)

On November 20, 2017, Rademaker reported to Nurse Herwig that she had been more depressed. (*Id*. at 1366.)

On December 5, 2017, Rademaker presented to the emergency department of Lutheran Hospital, complaining of depression with suicidal ideation. (*Id*. at 409.) She was admitted to the psychiatry department for treatment of depression.  (*Id*. at 412.)  During the hospitalization, Rademaker's medication was reconciled.  Due to Ms. Rademaker's previous failure on numerous medications, electroconvulsive therapy ("ECT") was discussed. On December 8, 2017, Rademaker was discharged with a diagnosis of major depressive disorder and post-traumatic stress disorder. She was noted to have continuing moderate symptoms. (*Id*. at 414.)

On December 12, 2017, Rademaker followed-up with Nurse Herwig, and reported that she continued to have suicidal thoughts but without the previous intensity. Nurse Herwig increased Rademaker's dose of Wellbutrin to 300 mg daily. (*Id*. at 1357.)

5

On December 18, 2017, Rademaker had an urgent appointment with Nurse Herwig, reporting that her anxiety increased with Wellbutrin.  Nurse Herwig adjusted the dosage of Wellbutrin. (*Id*. at 1355.)

On January 2, 2018, Rademaker discussed ECT treatment with Nurse Herwig. She reported that her mood had been down since mid November. Nurse Herwig initiated a trial of Seroquel. (*Id*. at 1351.)

On January 23, 2018, Ms. Rademaker reported to Nurse Herwig that she had stopped Seroquel almost immediately due to side effects of dizziness and nausea. (*Id*. at 1349.)  Nurse Herwig noted Rademaker was severely depressed, had very little socialization, and was very low functioning with regards to motivation and energy. (*Id*. at 1350.)

On February 5, 2018, Rademaker reported to Nurse Herwig that she was recovering from a surgery and planned to go back to work later in the week. Nurse Herwig noted that there may be some improvement as, prior to the surgery, Rademaker was not going to work due to depression. Rademaker also reported she was planning to undergo ECT the following week and was hopeful it would help her depressed mood. (*Id*. at 1347.)

On February 12, 2018, Rademaker returned to the Cleveland Clinic for an ECT assessment. It was noted that she had a flat affect, intense stare and was tearful.  (*Id*. at 779.)  Rademaker also underwent her first ECT treatment. The seizure duration was 62 seconds. (*Id*. at 784.)  The discharge instructions included having a responsible adult with Rademaker for the first 24 hour period after discharge, and to rest at home with moderate activity as tolerated. (*Id*. at 781.)

On February 14, 2018, Rademaker returned for a second ECT. She continued to exhibit depressive symptoms, and admitted to not showering.  Staff noted that Rademaker's hair still had

6

dried gel from the ECT two days prior. (*Id*. at 841.)  Rademaker was given her second ECT treatment with a seizure duration of 36 seconds. (*Id*. at 846.)

Prior to the third ECT treatment on February 16, 2018, Rademaker reported minimal improvement. (*Id*. at 900.)

Rademaker continued with ECT treatments three times a week throughout February 2018. (*Id*. at 963, 968, 1027, 1031, 1083, 1143, 1148.)

At her ECT appointment on February 28, 2018, Rademaker presented with a flat affect, and reported that she was not completing her activities of daily living, including showering.  Staff again noted she had dried gel from the ECT pads.  Rademaker was only willing to undergo ECT treatments every two weeks going forward. (*Id*. at 1198-99.)

On March 27, 2018, Rademaker returned to Nurse Herwig and reported that she was feeling "somewhat better" and able to return to work a few days per week. Rademaker told Nurse Herwig she was receiving ECT once every other week, and requested an increase in her Prozac. (*Id*. at 1343.)

On May 21, 2018, Rademaker reported to Nurse Herwig that she was not functioning well at work with ECT. She had lost her job due to attendance and she was having problems with short term memory so she was "taking a break" from ECT maintenance. Rademaker reported she was thinking of going back to an old part-time job until she determines whether she needs more ECT. (*Id*. at 1341.)

On July 3, 2018, Nurse Herwig completed a mental residual functional capacity assessment. (*Id*. at 1322-24.) Nurse Herwig reported that she had been treating Rademaker since July 3, 2017, for major depressive disorder, PTSD, and borderline personality disorder. Nurse Herwig opined that Rademaker had memory issues due to ECT which may cause her to be off-task if she were to get a

job. In addition, she opined that Rademaker's mood was not adequately stabilized and she would likely have difficulty with a full time job and attendance. (*Id*. at 1322.) Nurse Herwig estimated that, due to severe depression, Rademaker would miss up to five days per month. Nurse Herwig also opined that there were marked to extreme limitations in Rademaker's ability to maintain attention and concentration; perform activities within a schedule; maintain regular attendance; work with others; and, interact appropriately with the general public. (*Id*. at 1323.)

On August 7, 2018, Lisa Danevich, RN, BS completed a medical statement. (*Id*. at 1326-28.) Nurse Danevich reported treating Rademaker every two to three months for her major depressive disorder, borderline personality disorder and PTSD. She reported that Rademaker's symptoms included depression, sadness, irritability, inability to focus, short term memory loss and anxiety. She opined that Rademaker would likely be absent from work more than four days per month. (*Id*. at 1326.) Nurse Danevich further opined that Rademaker would be off-task over 25 percent of the work day.  (*Id*. at 1328.)

In a letter dated September 5, 2018, Diana Lorenzo, M.D. reported that Rademaker was under Dr. Lorenzo's care for major depressive disorder. Dr. Lorenzo attested that," due to history and functional limitations imposed by Rademaker's emotional/mental condition," Rademaker was "continuing to maintain her treatment for ECT."  (*Id*. at 1390.)

**2.      Physical Impairments**

Rademaker asserts her disability is based only on mental impairments.  (*Id*. at 36.) Therefore, no evidence of physical impairment was presented.

8

**C.**     **State Agency Reports**

    **1.**     **Mental Impairments**

On May 15, 2017, state agency psychological consultant, Mary K. Hill, Ph.D. reviewed Rademaker's file, and found evidence of a depressive disorder, anxiety disorder and eating disorder. Dr. Hill opined that Rademaker would have mild limitations in her ability to understand, remember or apply information; moderate limitations in her ability to interact with others; moderate limitations in her ability to concentrate, persist or maintain pace; and, moderate limitations in her ability to adapt or manage oneself. (*Id*. at 93.) Dr. Hill also completed a mental residual functional capacity assessment, in which she opined that Rademaker was able to perform one- to three-step tasks with no more than moderate pace or production quotas;  adapt to infrequent simple changes that are easily explained and demonstrated; and interact with others on a superficial basis; but she could not have customer service duties, conflict resolution or persuading others. (*Id*. at 96.)

On August 9, 2017, state agency psychological consultant, Kristin Haskins, Psy.D. reviewed Rademaker's file and affirmed Dr. Hill's assessment. (*Id*. at 119, 122-23.)

    **2.**     **Physical Impairments**

No physical impairments were alleged.

**D.**     **Hearing Testimony**

During the September 10, 2018 hearing, Rademaker testified to the following:

- She has been living with her mother in Bay Village, Ohio, for the past three years. (*Id*. at 36.)

- She is 5 feet 9 inches tall and about 180 pounds.  She can gain or lose 20 pounds as a side effect of various medications. (*Id*. at 37.)

- She has a driver's license and drives daily.  (*Id*.)

- She was fired from her last job, at a bookstore, in May.  (*Id*. at 38.)

- She has a boyfriend, who she met through a friend.  They met at a poetry reading. She tries to go to poetry readings once a month, sometimes to watch friends, and sometimes to read her own poetry.  (*Id*. at 38-39.)

- She is sometimes forgetful, so she brought a notebook with reminders to the hearing.  (*Id*. at 42.)

- She is unable to work because of her depression.  She was fired from her previous jobs because she is unable to show up to work consistently.  Some days, her depression prevents her from getting out of bed, or do "normal functioning" like showering, eating and putting on clean clothes.  If she is able to get to work, her depression makes it hard for her to focus and concentrate and remember how to perform certain tasks.  (*Id*. at 43.)

- When she is depressed, she feels a lot of anxiety.  This makes driving very difficult. (*Id*.)

- She gets migraine headaches when she is depressed, which she treats with over the counter medication.  (*Id*. at 44.)

- Her mother helps her by reminding her to perform basic self-care.  Sometimes she lacks motivation, but also, she forgets, because memory loss is a side effect of the treatment she is receiving.  (*Id*. at 45.)

- The only person besides her mother that she sees regularly is her boyfriend.  (*Id*.)

- She spends her days sleeping, trying to write poetry, and reading or watching tv. She has trouble concentrating sufficiently to read a book, and when the tv is on she usually will "zone out."  (*Id*.)

- She has a laptop computer she uses for her writing and to keep in touch with out-of-state friends through social media.  (*Id*. at 46.)

- The only chore she does at home is trying to remember to take out the garbage.  Her mom takes care of everything.  (*Id*.)

- Over the past several years, her mental health has gotten worse.  She has been hospitalized for depression and has pursued more intensive treatments because medication alone was not sufficient to control her depression.  (*Id*. at 47.)

10

- By "worse," she means that she is suicidal on a daily basis, and is unable to enjoy the things in life that she used to.  (*Id*.)

- Being in a group of people makes her anxious, even if she knows them.  A "group" could be as few as five people.  (*Id*. at 47-48.)

- Outside of doctor-prescribed treatments, she finds it is sometimes helpful to take a walk.  (*Id*. at 48.)

- She hasn't been able to go to poetry readings for the last couple of months because of her anxiety.  The last time she went, she just watched.  (*Id*. at 50.)

- She was willing to begin the ECT treatments because she was suicidal and "non functioning," unable to answer the phone, eat, shower, or interact with people.  (*Id*. at 51.)

- When she receives ECT treatments, she is at the hospital for about 3 hours.  Afterwards, she is always dazed, and has a headache, which lasts for about 24 hours after the treatment.  She is not permitted to drive for 24 hours after each treatment, and requires "adult supervision" during that time.  (*Id*.)

- She stopped her ECT treatments in February because "it's a very unpleasant experience," and she hoped she had recovered enough not to need treatments anymore. (*Id*. at 52.)

- When she stopped receiving ECT, her depression became "far worse," and she became suicidal again, so she resumed treatments in August, and currently receives ECT once or twice a week.  (*Id*.)

- She has been in counseling for about 20 years, and taken medication for her mental health for about 18 years.  (*Id*. at 53.)

- Her last job was part-time at a bookstore, and she missed work at least once a week, because her anxiety prevented her from leaving the house.  Her manager also told her she was not engaging enough with customers, and the ECT treatment caused her to forget how to use the computer, so she had to re-learn how to inventory books and do computer tasks.  (*Id*. at 53-54.)

- Her mother makes sure she eats, and organizes her medication in a daily pill organizer so that she can remind her to take it.  (*Id*. at 54.)

11

The VE testified Rademaker had past work as a receptionist and administrative clerk.  (*Id.* at 57.)  The ALJ then posed the following hypothetical question:

> [A]ssume an individual with Claimant's age and education with the past two positions you've described.  Further assume that the hypothetical individual is limited as follows . . . . Limited to performing simple routines and repetitive tasks, but not at a production rate pace, i.e., assembly line work, limited to simple work-related decisions and using her judgment and dealing with changes in the work setting.  Able to frequently interact with supervisors and . . . . occasional interaction with coworkers and the public.

(*Id.* at 57-58.)

The VE testified the hypothetical individual would not be able to perform Rademaker's past work as receptionist and administrative clerk.  (*Id.* at 58.)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as a cleaner, kitchen helper or merchandise marker.  (*Id.*)

The ALJ then altered the hypothetical to add that the individual would be unable to climb ladders, ropes or scaffolds; never be exposed to unprotected heights or moving mechanical parts; operate a motor vehicle; and,could only occasionally interact with coworkers.  (*Id.*)  The VE testified the three jobs she previously identified would still be available.  (*Id.* at 59.)

The ALJ asked a third hypothetical question that added the further limitation that the hypothetical individual could only occasional interaction with supervisors. The VE again testified that the three jobs she identified would remain available.  (*Id.*)

The ALJ's fourth hypothetical added the limitation that the individual could never interact with the public. The VE testified the three jobs she identified previously remained available.  (*Id.*)

The ALJ's fifth hypothetical added to the previous hypothetical questions the limitation that the hypothetical individual would be off-task twenty percent of an eight hour work shift and/or

12

absent from work two days per month.  (*Id*. at 59-60.) The VE testified that, under either of these conditions, there would be no work that would be sustainable.  (*Id*. at 60.) She explained that a worker who is off task more than fifteen percent of the time or absent more than on day per month would be unable to sustain employment. (*Id*.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.   20 C.F.R.  §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment

that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Rademaker was insured on her alleged disability onset date, and remained insured through June 30, 2020, her date last insured ("DLI.") (Tr. 17.) Therefore, in order to be entitled to DIB, Rademaker must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2020.

2.  The claimant has not engaged in substantial gainful activity since February 24, 2017, the alleged onset date.

3.  The claimant has the following severe impairments: depression, borderline personality disorder, post-traumatic stress disorder (PTSD), and anxiety.

14

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I.

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes, or scaffolds; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. She is limited to performing simple, routine and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to frequently interact with supervisors and occasionally interact with coworkers and the public.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born on ****, 1979 and was 37 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 24, 2017, through the date of this decision.

(Tr. 17-24) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's

decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for

16

reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.        Listing 11.02A

Rademaker first asserts that the ALJ erred by failing to consider whether her impairment met the requirements of Listing 11.02(A), which discusses epilepsy.  (Doc. No. 13 at 11-12.)  She notes that the ECT treatment she regularly received stimulated seizures, which she asserts meet the definition of generalized tonic clone seizures in the regulations, and therefore fulfill the requirements of this listing.  (*Id*. at 12.)

17

The Commissioner responds that Rademaker is overlooking the requirement that a medically determinable impairment cause the symptoms which satisfy the listing requirements. (Doc. No. 14 at 10-11.) In this case, Rademaker's seizures are caused by her treatment, and she has not asserted that she has any neurological impairments. (*Id*. at 11.)

In addition to considering whether the ALJ's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the ALJ to follow the five-step sequential evaluation process and all Social Security Rules as promulgated by the agency is grounds for remand. *See, e.g., Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 416 (6th Cir. 2011) (remanding the case for further proceedings when the ALJ failed to analyze whether the petitioner's impairments met or equaled a listing at Step Three); *Dreher v. Comm'r of Soc. Sec. Admin.*, No. 1:15CV1412, 2016 WL 4920000, at *9 (N.D. Ohio June 7, 2016), *report and recommendation adopted sub nom, Dreher, v. Colvin*, No. 1:15CV1412, 2016 WL 4939334 (N.D. Ohio Sept. 14, 2016) ("[T]his Court nevertheless finds that remand is proper due to the insufficiency of the ALJ's Listings analysis at Step Three."). However, remand is not necessary if the lack of analysis at Step Three is harmless. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

At Step Three, the ALJ must determine whether the claimant's impairment "meets or equals" one of the listed impairments enumerated in appendix 1, subpart P of 20 C.F.R. § 404 [hereinafter "Listing of Impairments"]. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The Listing of Impairments. . . describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Reynolds,* 424 F. App'x at 414 (quoting 20 C.F.R. § 404.1525(a)).

18

The ALJ must first look to see if the claimant's impairment is listed. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). If the claimant's impairment is listed, the ALJ must look at the listing and determine whether the claimant satisfies all of the criteria to "meet" the listing. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the ALJ determines that the claimant meets the listing, the claimant will be deemed conclusively disabled and entitled to benefits. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant's impairment is not listed, the ALJ must determine whether the claimant's impairment is equal to one of the listings. *Reynolds,* 424 F. App'x at 414  15 ("An administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment."); §§ 404.1520(a)(4), 416.920(a). If the claimant's impairment is equal to one of the listings, the claimant will also be deemed conclusively disabled. §§ 404.1520(d), 416.920(d).

It is the claimant's burden to bring forth evidence at Step Three to establish that their impairments meet or are medically equivalent to a listed impairment. *See Forrest*, 591 F. App'x at 366; *Lett v. Colvin*, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). However, the ALJ must properly articulate her findings to permit meaningful review at every step and "the ALJ must build an accurate and logical bridge between the evidence and [her] conclusion." *Snyder v. Comm'r of Soc. Sec. Admin*., 210 Soc. Sec. Rep. Serv. 229, No. 5:13CV2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) (citations omitted in original) (*quoting Woodall v. Colvin*, No. 5:12cv1818, 2013 WL 4710516, at *10 (N.D.Ohio Aug. 29, 2013)).  If the ALJ does not provide meaningful analysis in concluding whether the claimant's impairment "meets or equals" any of the listings in the Listing

of Impairments, the Court may look at the ALJ's decision in its entirety to see if the ALJ made

sufficient factual findings to support the conclusion at Step Three. *See Forrest,* 591 F. App'x at 366

(upholding the AL''s Step Three findings where "the ALJ made sufficient factual findings elsewhere

in his decision to support his conclusion."); *Bledsoe v. Barnhart,* 165 F. App'x 408, 411 (6th Cir.

2006) (reasoning that there is no need to require the ALJ to "spell out every fact a second time under

the step three analysis."); *Snyder,* 2014 WL 6687227, at *9 ("[I]t may be proper to consider the

ALJ's evaluation of the claimed impairments at issue at other steps of his decision.").

> Listing 11.02A requires the following:
>
> 11.02. Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:
>
> A. Generalized tonic-clonic seizures (see 11:00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)

20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.02.

Epilepsy is defined as "a pattern of recurrent and unprovoked seizures that are

manifestations of abnormal electrical activity in the brain," including generalized tonic-clonic

seizures. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 111.00(F)(1).  Generalized tonic-clonic seizures is

defined as follows:

> a. *Generalized tonic-clonic seizures* are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §111.00(F)(1)(a).

In our case, the ALJ did not find any severe physical or neurological impairments at Step Two, and Rademaker does not dispute this finding - indeed, her counsel advised the ALJ at the hearing that Rademaker's claim involved only mental impairments.  (Tr. 36.)  The seizures are not a side effect of ECT treatment - they are the core of the treatment.  The National Institute of Mental Health ("NIMH") explains:

> Before ECT is administered, a person is sedated with general anesthesia and given a medication called a muscle relaxant to prevent movement during the procedure. An anesthesiologist monitors breathing, heart rate and blood pressure during the entire procedure, which is conducted by a trained medical team, including physicians and nurses. During the procedure:
>
> •   Electrodes are placed at precise locations on the head.
>
> •   Through the electrodes, an electric current passes through the brain, causing a seizure that lasts generally less than one minute. Because the patient is under anesthesia and has taken a muscle relaxant, it is not painful and the patient cannot feel the electrical impulses.
>
> •   Five to ten minutes after the procedure ends, the patient awakens. He or she may feel groggy at first as the anesthesia wears off. But after about an hour, the patient usually is alert and can resume normal activities.

National Institute of Mental Health, *How ECT Works*, available at https://www.nimh.nih.gov/ health/topics/brain-stimulation-therapies/brain-stimulation-therapies.shtml, last visited August 26, 2020.  While some patients require only an initial course of ECT treatment, the NIMH explains that, for others "maintenance ECT treatment is sometimes needed to reduce the chances that symptoms will return. ECT maintenance treatment varies depending on the needs of the individual, and may range from one session per week to one session every few months." *Id.*  These carefully scheduled and controlled therapeutic seizures do not meet the definition of epilepsy, for the reasons set forth below.

21

The threshold requirement to satisfy Listing 11.02(A) is that a claimant must have epilepsy, which requires "recurrent and unprovoked seizures." See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(H)(1). It is undisputed that Rademaker does not have epilepsy, and her ECT treatments, involved clinically-induced seizures, which were deliberately "provoked." (Tr. 780, 842, 901, 963, 1028, 1083, 1144, 1199, 1255). Further, Rademaker offers no precedent for her assertion that a treatment - induced seizures - should be considered an impairment at Step Three. The Commissioner describes this as a "novel" argument. (Doc. No. 14 at 11.) This Court could find no prior case law evaluating ECT-induced seizures as impairments, and no authority for determining they met the requirements of a listing.

The ALJ is not required to articulate his analysis of listing criteria that are neither part of a claimant's medical records, nor included in her claimed medically determinable impairments. *See Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013) ("the ALJ need not discuss listings that the appellant clearly does not meet, especially when the claimant does not raise the listing before the ALJ"). Therefore, Rademaker's first assignment of error is without merit.

**B.**     **The Opinion Evidence of Treating Nurse Practitioner Herwig**

Next, Rademaker asserts that the ALJ erred by giving "great weight" to the opinions of state agency reviewing psychiatrists and the consultative examiner, and "little weight" to the opinion of her treating nurse practitioner, Nurse Herwig. (Doc. No. 13 at 13.) While Rademaker acknowledges the validity of the non-treating source opinions "at the time the opinions were rendered," she asserts that the record shows her condition "significantly deteriorated subsequent to the date of these opinions," requiring hospitalization and ECT. (*Id*.) Nurse Herwig treated Rademaker during this later period, at the time of her hospitalization, and afterwards as she underwent ECT. (*Id*.)

22

Rademaker argues that it was error to dismiss Nurse Herwig's opinion because it was inconsistent with those of the non-treating sources, because it covered a different period and her condition was fluid.  (*Id*. at 15.)

The Commissioner responds that the ALJ properly rejected Nurse Herwig's opinions because they were contradicted by the more persuasive State agency reviewing psychologists' opinions and inconsistent with the largely unremarkable treatment evidence.  (Doc. No. 14 at 12.)

Under Social Security Regulations, a nurse practitioner is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys.  *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).[3]  However, the regulations require that these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c).  The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning."  20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[4] further explains how opinion evidence from "other sources" should be treated.  SSR 06-03p provides information from "other sources" (such as a chiropractor) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the

---

[3]    For claims filed prior to March 27, 2017.  *See* 20 C.F.R. §§ 416.902(a)(7). Rademaker's claim was filed February 27, 2017.

[4]    The Court notes SSR 06-03p was rescinded on March 27, 2017.  This rescission is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1. Rademaker's claim was filed February 27, 2017.

23

individual's ability to function."  SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006). Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also Williams v. Colvin,* No. 5:15-cv-2185, 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017) ("While the Court will not go so far as to hold that the failure to comment on the weight given to an 'other source' opinion will always require remand, here, the omission precludes meaningful judicial review").

> The ALJ explained his weighing of Nurse Herwig's opinion as follows:

> The undersigned gives little with [sic] to the opinion of the claimant's nurse practitioner, Grace Herwig, APRN, who opined that the claimant has mild to marked limitation in her domains of mental functioning.  The undersigned also gives little weight to the opinion of the claimant's nurse, Lisa Danevich, RN, who opined that the claimant would be off task 25% of the work day and could be expected to be absent from work 4 days per month due to her mental health symptoms.  Mss. Herwig and Daveich's [sic] opinions are inconsistent with the medical evidence of record, the opinions of Drs. Hill and Haskins, and Dr. Sobieralski's examination findings.  The medical record evidence showed the claimant's recent mental status evaluations were within normal limits and her symptoms were improved with treatment.  Moreover, the claimant reported an intent to return to work.

(Tr. 21-22) (internal citations omitted).

The ALJ does not address two of the three factors identified by the Sixth Circuit: how long Nurse Herwig treated Rademaker, and how well she explained her opinion.  Further, as Rademaker

24

notes, the inconsistency between Nurse Herwig's opinion and those of the earlier non-examining doctors is not a rational basis to discredit any of the opinions.  The record is replete with evidence that Rademaker's mental health deteriorated significantly between August 9, 2017, the date of Dr. Haskins' opinion,[5] and July 3, 2018, the date of Nurse Herwig's opinion.  She was hospitalized in December 2017, and began ECT treatments in February 2018.  (Tr. 409, 779.)  While "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record," *Helm v. Comm'r of Soc. Sec*., No. 10  5025, 2011 WL 13918 at *4 (6th Cir. Jan. 4, 2011), the Sixth Circuit does require "some indication that the ALJ at least considered [later treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).

The ALJ cites medical records from throughout the relevant period, but he does not acknowledge the change in Rademaker's condition, instead using the fact that they document change as evidence of inconsistency.  For example, he describes Nurse Herwig's opinion as inconsistent with the record of a March 19, 2018 ECT appointment at which the examining physician, Dr. Lorenzo, described Rademaker as "alert and oriented." (Tr. 1250.)  In that record, Dr. Lorenzo also noted that Rademaker "has +FHX depression but denies anything requiring ECT. [Patient] was admitted in 12/2017 for suicidal thoughts, but since under new meds and therapy, doing better." (*Id*. at 1248.)  However, record evidence shows that Rademaker had been receiving ECT three times a week since February 2018, and was advocating for a reduction in the treatment at this appointment.

---

[5]  The opinion of consultative examiner Dr. Sobieralski is dated April 27, 2017. (Tr. 330-336.)  The opinion of state agency reviewing consultant Dr. Hill is dated May 15, 2017.  (*Id*. at 93.)

If Dr. Lorenzo believed that Rademaker did not need ECT, she would not have administered it at that appointment - but records show she did so, and scheduled more ECT treatments for the following week.  (*Id.*)  Further, Dr. Lorenzo's observation that Rademaker was "doing better" was in relation to her prior hospitalization, and therefore not inconsistent with Nurse Herwig's opinion, which did not suggest Rademaker required hospital care.

The ALJ also describes Nurse Herwig's opinion as inconsistent with treatment records from Far West Center.  In the earliest Far West Center record, dated November 21, 2017, her counselor described her as having "good" insight and being "reflective and insightful."  (*Id*. at 1364.) Rademaker reported an increase in depression symptoms, and described "struggling" with what to do at work, because she felt that "she needs to start looking for a job, but does not want to start that process yet."[6] (*Id*.) Next, the ALJ cited a treatment record dated February 5, 2018, when Rademaker was reportedly homebound, recovering from surgery.  (*Id*. at 1347.)  The couselor described her as "depressed," but "cooperative," with a "linear" thought process and "fair" judgment and insight.  (*Id*. at 1347-48.)  She told her counselor that it was "hard to tell" if recent medication changes had made any difference, but she reported "she plans to go back to work later this week," which the counselor observed "may demonstrate some improvement as she was not going to work due to depression prior to the surgery."  (*Id*. at 1347.)  She requested and received an increase in her dosage of Prozac.  (*Id*.) That record also notes Rademaker had a more immediate plan: "[s]he will be going to Lutheran for an intake for ECT next week.  She is looking forward to this as she is hopeful it will help depressed

------

[6]  The ALJ does not cite the record immediately subsequent, which documents Rademaker's "tearful" call to report that her depression symptoms has increased to the point that her suicidal feelings "overwhelmed" and scared her, and she had asked her mother to take her to the hospital.  (Tr. 1363.)

mood." (*Id.*)  The last cited record, dated June 20, 2018, documents a phone call checking in on Rademaker, who had been absent from therapy for "a couple of months." (*Id*. at 1339.)  Rademaker told the caller that she was doing "well," but had lost her job.  (*Id.*)

Again it is unclear how the ALJ found the cited records to be inconsistent with Nurse Herwig's opinion.  The first record was two weeks prior to Rademaker's December 2017 hospitalization.  The ALJ specifically refers to Rademaker's statement that she intended to resume work in the second record, but while this was clearly interpreted as a positive sign for her mental health, the record does not indicate the therapist perceived this as a reasonable possibility for the forseeable future.  To the contrary, the statement was made less than a month after Rademaker's hospitalization for suicidal thoughts, and her depression remained severe enough that she was beginning ECT treatment the following week.  The third record is not more than a phone call during which Rademaker reported doing "well," although she had again lost her job.  At her hearing, she explained that she was fired due to depression and side effects from the ECT, which is consistent with Nurse Herwig's opinion, which explicitly relates some of Rademaker's mental functioning limitations to side effects of the ECT treatments, which Rademaker had not undergone at the time of the non-treating source opinions, or the first and second cited records.

The standard for treatment of an opinion from a treatment provider who is not an acceptable medical source is highly deferential toward the ALJ.  The nurse practitioner is an "other source," and therefore the ALJ was not required to accord any particular weight to her opinion nor was he required to provide "good reasons" for rejecting it.  Rather, the ALJ was required only to evaluate the opinion using the applicable factors set forth in the regulations.  *See Cruse*, 502 F.3d at 541.  Although no "good reasons" were articulated here, and the ALJ evaluated Nurse Herwig's

opinion using only one of the three statutory factors, the highly deferential standard requires the Court to finds the ALJ properly evaluated Nurse Herwig's opinion.  However, because the Court finds merit in Rademaker's third assignment of error, on remand, the ALJ should carefully consider and address the way that the change in Rademaker's condition over time is reflected in all the opinions the ALJ weighed.

**C.**      **ALJ's failure to Consider the Limitations and Restrictions resulting from ECT**

Rademaker's last assignment of error asserts that  the ALJ erred by failing to include the limitations and restrictions associated with Rademaker's ECT treatments when assessing her residual functional capacity ("RFC").  (Doc. No. 13 at 14.)

The Commissioner responds that the ALJ properly considered the totality of medical and non-medical evidence when determining Rademaker's RFC.  (Doc. No. 14 at 16-17.)  He asserts that Rademaker fails to identify any relevant evidence that compels an RFC different from the ALJ's. (*Id*. at 17.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* 20 C.F.R. § 416.946(C); S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon

28

which he is relying, and he may not ignore evidence that does not support his decision, especially

when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp.2d

875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir.

2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual

functional capacity determination,' and must also 'mention or refute [...] contradictory, objective

medical evidence' presented to him."). *See also* SSR 96  8p ("The RFC assessment must always

consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from

a medical source, the adjudicator must explain why the opinion was not adopted.").

It is well established there is no requirement that the ALJ discuss each piece of evidence or

limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing

*Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss

every piece of evidence in the record); *Arthur v. Colvin,* No. 3:16CV765*,* 2017 WL 784563, at *14

(N.D. Ohio Feb. 28, 2017) (accord).  However, courts have not hesitated to remand where an ALJ

selectively includes only those portions of the medical evidence that places a claimant in a capable

light, and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g.,*

*Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ

"cherry-picked select portions of the record" rather than doing a proper analysis); *Germany  Johnson*

*v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was

"selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249,

2015 WL 1757474 at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective

evidence and erred by selectively including only the portions of the medical evidence that placed

Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11  CV  2313, 2013 WL 943874

(N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.");

*Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

In our case, the ALJ found Rademaker had the following RFC:

> The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes, or scaffolds; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. She is limited to performing simple, routine and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to frequently interact with supervisors and occasionally interact with coworkers and the public.

(Tr. 19.)  He explained the basis for this determination as follows:

> The claimant is a 39-year-old woman with a college education.  She alleges disability due to depression, anxiety, borderline personality disorder, alcoholism, post-traumatic stress disorder, and eating disorder.  Her alleged onset date is February 24, 2017.  She has not engaged in substantial gainful activity since that date.  At the hearing, she testified to the following.  Due to her mental health impairments, the claimant has difficulty with memory, concentration, focus and task completion.  Her anxiety affects her ability to interact with others, and her depression causes a lack of motivation.  She has experienced suicidal ideations and has difficulty completing her activities of daily living.  Her medications are not effective.  Due to her symptoms, she accrued excessive absences and has been fired from employment as a result.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The claimant sought treatment for symptoms related to her mental health conditions. The medical evidence shows that the claimant presented to her appointments fully alert and oriented to time, place and person. Psychotherapy notes showed that the claimant presented with depressed and anxious mood and flat affect at times, however, the evidence also showed that the claimant presented with normal mood and affect. The claimant presented to the hospital for voluntary inpatient care for suicidal ideation with a plan. At the times she was admitted for treatment, she exhibited depressed mood and abnormal psychomotor activity, but she also exhibited normal behavior, normal judgment, and her memory was intact. In patient treatment notes showed that with medication adjustment the claimant showed progressive improvement, including appropriate participation in therapy groups. She was discharged three days later in stable condition. Despite claimant's allegations of impaired memory and concentration, the medical evidence generally showed that the claimant's cognition was intact. Psychotherapy notes show that she was able to understand and engage in her treatment goals, articulate her needs and identify coping methods. The claimant's treatment plan included Buspar, Abilify, Prozac, and Electroconvulsive therapy (ECT). During recent treatment, she reported that Buspar effectively managed her anxiety symptoms and reported feeling stable with. [sic] She also reported feeling less depressed. Moreover, psychotherapy notes indicated that her activities of daily living were within normal limits.

As for the claimant's statements about the intensity, persistence and limiting effects of her symptoms, they are inconsistent because they are not fully supported by the medical evidence of record. The claimant testifies that headaches are a symptom of her mental health impairments; however, treatment notes showed that she described the headaches as slight and dull. The claimant testified that her medications did not work, but psychotherapy notes showed that she reported improved mood with her treatment plan and she articulated plans to return to work. She also testified that she [had] difficulty being around others, but the record showed that she reported spending time with her family and boyfriend, and going shopping.

(*Id.* at 20-21) (internal citations omitted). Next, the ALJ assessed the opinion evidence as discussed in the previous section.

As discussed in the previous section, the ALJ failed to acknowledge or discuss that the ECT treatment Rademaker was undergoing had side effects, such as impaired memory and concentration, which impacted her ability to function in a work setting. This is evident in his mischaracterization

31

of her testimony, which he summarizes as stating that "Due to her mental health impairments, the claimant has difficulty with memory, concentration, focus and task completion." (*Id*. at 21.)  In fact, Rademaker testified that "The memory loss is from the ETC. . . . the ECT it causes headaches and just a general sort of feeling kind of spaced out." (*Id*. at 49.)  Because the ALJ misidentifies these issues only as "symptoms related to her mental health conditions," he draws from record evidence prior to the period in which Rademaker was receiving ECT to demonstrate that her memory and cognition were normal, asserting "the medical evidence generally showed that the claimant's cognition was intact." (*Id*. at 20-21.)  This is both true and irrelevant to Rademaker's contention that her ECT treatments affected her cognition.

The ALJ's failure to acknowledge the change in Rademaker's mental health functioning over time and the significance of her ECT treatments led to other mischaracterizations of the record evidence in his decision as well.  For example, he writes that Rademaker's testimony that her medications were not working was contradicted by medical record evidence that "that Buspar effectively managed her anxiety symptoms and reported feeling stable with [blank]." (*Id*. at 21.)  The fragment at the end of this sentence is telling, as there is no evidence that medication stabilized Rademaker's condition, which is why her treatment progressed to ECT, a treatment appropriately prescribed for serious, treatment-resistant depression.  As NAMI explains, "This type of therapy is usually considered only if a patient's illness has not improved after other treatments (such as antidepressant medication or psychotherapy) are tried."  National Institute of Mental Health, *Electroconvulsive therapy*, available at https://www.nimh.nih.gov/health/topics/brain -stimulation-therapies/brain-stimulation-therapies.shtml, last visited August 26, 2020.  Rademaker testified that she found ECT therapy "very unpleasant," and tried to discontinue her ECT

maintenance treatment in February 2018. (*Id*. at 52.)  However, when Rademaker stopped receiving ECT, her depression became "far worse," and she became suicidal again, so she resumed treatments in August 2018, and currently receives ECT once or twice a week.  (*Id*.)  She also provided a note from Dr. Lorenzo explaining that "due to her history and functional limitations imposed by her emotional/mental condition she is continuing to maintain her treatment for Electroconvulsive therapy."  (*Id*. at 1390.)  Thus, both Rademaker's testimony and the medical record evidence demonstrate that ECT, not medication, was required to stabilize her mental condition - and "stable" appears to mean "non-suicidal."  Rademaker could reasonably perceive her treatments as "not working" when she continued to experience symptoms of depression, while at the same time clinicians might view the treatments as "effective" because she was no longer an imminent danger to herself.

The Commissioner implicitly acknowledges that the ALJ did not address the side effects of the ECT treatment in his decision, but asserts that this was a harmless error because Rademaker did not show that any off-work restrictions due to her ECT treatments would last for twelve months or more.  (Doc. No. 14 at 17.)  It is undisputed that, at the time of the ALJ's decision Rademaker had not been receiving ECT for 12 months.  Rademaker began ECT treatments in February 2018, at some point attempted to discontinue the treatments, and then resumed them. The last medical record evidence referencing ECT is the letter from Dr. Lorenzo in August 2018 stating that Rademaker was "continuing to maintain her treatment for Electroconvulsive therapy." (Tr. 1390.)  At her September hearing, Rademaker testified that her ECT treatments were ongoing, and she was receiving them "once or twice a week," and that when she tried to stop receiving ECT, she became suicidal.  (*Id*. at 52.)  The ALJ's decision was issued on December 13, 2018.  (*Id.* at 12.)  The Commissioner offers

33

no evidence supporting his conclusion that Rademaker would not continue to receive ECT treatments.

The Commissioner also argues that ECT protocols did not expressly prohibit Rademaker from working after undergoing these treatments, and that she repeatedly expressed the desire to return to work part-time are less compelling. (Doc. No. 14 at 17.)  The ECT discharge instructions stated that Rademaker needed to have the supervision of a "responsible adult" and "rest at home with moderate activity as tolerated," and no driving for 24 hours after each treatment.  (Tr. 781, 843, 902, 964, 1026, 1082, 1144-45, 1200, 1256.)  While they do not explicitly address work, there is no indication that the ALJ considered these restrictions in formulating Rademaker's RFC.  The Commissioner notes that Rademaker testified that she drove "pretty much every day," but the ALJ did not ask whether Rademaker was complying with the driving restrictions in her ECT discharge instructions, and there is no evidence that she was not doing so.  (Doc. No. 14 at 18.)  Further, this mischaracterizes Rademaker's testimony that her anxiety sometimes prevented her from driving, and often required strategies such as driving to her destination hours before she needed to be there in order to avoid heavy traffic.  (Tr. 43.)

All three of the Commissioner's arguments are impermissible *post hoc* rationalization, as no such concerns were articulated or even implied by the ALJ, who failed to acknowledge this issue existed.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Courts consideration." *Blackburn v. Colvin*, No. 5:12CV2355, 2013 WL 3967282 at *8 (N.D. Ohio July 31, 2013); *see also Cashin v. Colvin*, No. 1:12 CV 909, 2013 WL 3791439 at *6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, No. 1:10 CV 02936, 2012 WL

253320 at *5 (N.D. Ohio Jan. 26, 2012).  Here, the various arguments now advanced by the Commissioner were not articulated by the ALJ as reasons for omitting any limitations relating to the side effects of Rademaler's ECT treatments.  Accordingly, this Court rejects the Commissioner's *post hoc* rationalizations, and finds remand is necessary, thereby affording the ALJ the opportunity to properly address the evidence of the impact of the side effects of ECT treatments on Rademaker's functional capacity.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and REMANDED for further proceedings consistent with this decision.  On remand, the ALJ should consider and address the evidence of the impact of the side effects from her ECT treatments on Rademaker's RFC, as well as the way that the change in Rademaker's condition over time is reflected in the medical evidence and all the opinions the ALJ weighed.

**IT IS SO ORDERED.**


 _s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: September 16, 2020

35